# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR09-02814-TUC-DCB(JM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| JESUS IVAN BARRON-GARCIA, | |
| Defendant. | |

A Motion to Suppress Statements (Docket 30) filed by Defendant Jesus Ivan Barron-Garcia ("Barron-Garcia") was heard by Magistrate Judge Marshall on September 15, 2010.[1] Defendant was present at the hearing and represented by counsel. Three witnesses were presented by the Government: U.S. Border Patrol Agents Eric Reeder, Claudio Lopez and Robert Pacheco. The witnesses were examined, cross-examined, and questioned by the Court. Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant Barron-Garcia's Motion to Suppress be granted to the extent described below.

. . . .

. . . .

. . . .

. . . .

---

[1] By Notice of Partial Withdrawal, Barron-Garcia withdrew his argument concerning a potential 12-day delay from arrest to interrogation based on information he received after filing the motion. (Docket 39.)

## I.  **FINDINGS OF FACT**

On November 25, 2009, Border Patrol Agent Eric Reeder was patrolling an area just east of the port of entry at Naco, Arizona. (Tr. 14-15.)[2] The area is equipped with approximately 30 strategically placed cameras designed to assist in detecting entrants. (Tr. 16.) At approximately 6:00 p.m., the Agent Reeder heard radio traffic from the Border Patrol control room which monitors the border cameras that there were possible illegal aliens heading northbound from the international boundary line just west of the town of Naco and the port of entry. (Tr. 16.)

After receiving the radio report, Agent Reeder drove north from his location to a railbed where he traveled west to the general location reported by the control room. (Tr. 17.) Once there, he parked his vehicle on the railbed and continued walking west and located Barron-Garcia huddled in the brush along with several other individuals just north of the railbed. (Tr. 17, 19.) As Agent Reeder approached the group, he determined it was a group of seven and identified himself in Spanish as a Border Patrol agent. (Tr. 19-20.)

Agent Reeder, in Spanish and using a firm tone, then asked the group if they were in the United States illegally, their country of citizenship, and if they have or have applied for documents that would allow them to be in the United States legally. (Tr. 20-21.) Barron-Garcia told the agent that he was from Mexico and that he was in the United States illegally and had no documentation which allowed him to be there. (Tr. 21.) The questioning lasted only a few seconds. (Tr. 21-22.)

Agent Reeder, who was armed but did not unholster his weapon, then walked the group approximately 1/4 mile back to his vehicle, where they were met by another agent in a transport vehicle. (Tr. 22, 33.) When the group arrived at the location of the transport vehicle, Agent Reeder proceeded to complete a write-up form, Form I213/826, designed to obtain biographical information, such as name, age, date of birth and country of origin, and

---

[2]"Tr." refers to the Transcript of Pretrial Motions Hearing dated September 15, 2010, and filed with the Clerk on September 17, 2010 (Docket 55).

1 where and when they entered to the United States. (Tr. 22-23, 24; Ex. 5.) Agent Reeder also
2 performed "quick searches" for safety purposes and collected the groups belongings in
3 individual bags. (Tr. 22-23, 37-38.) The individuals are then permitted to read the form and
4 sign it. (Tr. 23.) The form also informs the individuals in Spanish that they "have the right
5 to a[n] immigration tribunal, they have a right to a lawyer if they so chose that. They have
6 the right to also say I am here illegally and I wish to simply return to my country." (Tr. 23.)
7 Such a form was completed for Barron-Garcia and each of the other individuals in the group
8 after they had walked about 20 minutes to the transport vehicle. (Tr. 23-24.) The seven in
9 the group were then transported to the Naco station and Agent Reeder had no more
10 involvement in the case. (Tr. 25.)

11 The following morning, November 26, 2009, Agent Claudio Lopez was charged with
12 processing Barron-Garcia. (Tr. 54-55.) By that time, a decision had been made to criminally
13 prosecute Barron-Garcia. (Tr. 71.) Without reading Barron-Garcia his rights, Agent Lopez
14 reviewed with Barron-Garcia the information contained on the I-826 field processing form
15 that was completed by Agent Reeder. (Tr. 72; Ex. 5.) The information included his name,
16 date of birth, birthplace, mother's name, citizenship, and his eligibility to be in the United
17 States. (Tr. 72-73.) Barron-Garcia was then returned to the area of the holding cell. (Tr.
18 74.)

19 About half an hour later, at 10:30 a.m., Agent Lopez read Barron-Garcia his Miranda
20 warnings in Spanish from a card that the agent had received at the training academy and
21 Barron-Garcia signed Form I-214, a waiver of rights. (Tr. 55-58, 78; Ex. 1.) At some point,
22 Agent Lopez, who does not recall precisely how, informed Barron-Garcia that he was going
23 to be prosecuted. (Tr. 84.) Next, Agent Lopez began reviewing Form I867A with Barron-
24 Garcia by reviewing with him the introductory paragraphs to the form (Tr. 79.), which
25 provide as follows:

26       I am an officer of the United States Department of Homeland
      Security. I am authorized to administer the immigration laws
27       and to take sworn statements. I want to take your sworn
      statement regarding your application for admission to the United
28

3

> States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.
>
> You do not appear to be admissible or to have the required legal papers authorizing your admission to the Untied States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed form this country, and if so, you may be barred from reentry for a period of 5 years or longer.
>
> This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> Except as I will explain to you, you are not entitled to a hearing or review.
>
>> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed form the Untied States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the Untied States and not be removed because of that fear.
>
> Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.
>
> Any statement you make may be used against you in this or any subsequent administrative proceeding.

(Ex. 2.)

Because a translation of these paragraphs was not available, Agent Lopez either tried to do the best he could or obtained assistance from someone else to translate the information. (Tr. 80.) When asked if he had assistance in this case, Agent Lopez thought it likely, but could not identify who that might have been (Tr. 80-81.), and stated:

> Well, if I – if I had the help I actually would have – I mean if I needed the help, I actually would have had the help to provide me the speak – I mean, to actually have – translate that into Spanish.

4

1  (Tr. 81.) If he did not have help, he would have paraphrased the information and "just
2  generally tell him what it means . . . ." (Tr. 81.)
3        Agent Lopez then proceed to take the sworn statement, reading questions in Spanish
4  to Barron-Garcia from a form and then typing the answer. (Tr. 60-61; Ex. 2 (I-867A).)
5  Barron-Garcia and Agent Lopez initialed the sworn statement. (Tr. 61.) Agent Lopez then
6  prepared a jurat which indicating that Barron-Garcia had no credible fear of returning to
7  Mexico. (Tr. 62; Ex. 3 (I-867B).) Above the signature line, the jurat provides the following
8  statement:

> I have read (or have had read to me) this statement, consisting of  1  pages (including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above named officer of the Department of Homeland Security. I have initialed each page of this statement (and the corrections noted on page(s) _____ ).

13  (Ex. 3.) After he was given the chance to review the jurat, but without having the
14  endorsement read to him, Barron-Garcia signed the jurat along with Agent Lopez and a
15  witness. (Tr. 86-87; Ex. 3.)
16        With the information he obtained from Barron-Garcia during the sworn statement and
17  the field processing form (Form I213/826), Agent Lopez completed Form I-213 which is
18  titled "Record of Deportable/Inadmissible Alien." (Tr. 64-65; Ex. 7.) Agent Lopez was then
19  done with his involvement with Barron-Garcia. (Tr. 88.)
20        Due to the Thanksgiving holiday, Barron-Garcia did not appear for his initial
21  appearance until Monday, November 30, 2009. (Tr. 98.)

22  **II.    CONCLUSIONS OF LAW**
23      **A.    *Miranda***
24        The Fourth Amendment prohibits "unreasonable searches and seizures" by the
25  government. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). An investigatory stop need not be
26  supported by probable cause in order to comport with the Fourth Amendment. Instead, an
27  officer may perform such a stop if he has a reasonable and articulable suspicion that a suspect
28

has committed a criminal offense. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Hayes v. Florida*, 470 U.S. 811, 816 (1985). For example, when a Border Patrol Agent has reasonable suspicion to suspect a person of entering the country illegally, he may briefly stop that person and inquire into his citizenship and immigration status. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884-885 (1975). However, the stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id*. at 881-82. Law enforcement officers must also diligently pursue their investigation to confirm or dispel their suspicions quickly during an investigative stop. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Here, Barron-Garcia concedes that Agent Reeder's initial questioning of him at the location where he was found was supported by *Terry*. (Tr. 108.) At that point, the agent's questioning of Barron-Garcia was non-custodial. *United States v. Montero-Camargo*, 177 F.3d 1113, 1121-22 (9th Cir.) (questions asked of motorist regarding alienage of driver and passengers constituted routine non-custodial pre-arrest questioning), *amended by* 183 F.3d 1172, *withdrawn by* 192 F.3d 946 (1999), *reinstated by* 208 F.3d 1122, 1228 n.8 (2000). However, he argues that after the group had been walked by Agent Reeder to the transport vehicle, any statements must be suppressed because he was not first advised of his *Miranda* rights. The Court agrees.

Agent Reeder's actions from the conclusion of the initial questioning and the commencement of the second round of questioning at the transportation vehicle leave no doubt that Barron-Garcia, when he was questioned for the second time, was "in custody" for purposes of *Miranda*. Under *Miranda*, statements that are the product of interrogation not preceded by appropriate warnings are inadmissible if the accused was questioned while "in custody or otherwise deprived of his freedom of action in a significant way." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). "A defendant is in custody when, based upon a review of all the pertinent facts, 'a reasonable innocent person in such circumstances would conclude after brief questioning he or she would not be free to leave.'" *United States v. Wauneka*, 770 F.2d 1434, 1438 (9th Cir.1985). In circumstances involving alienage, the test is further

6

1 refined to allow consideration from the viewpoint of the reasonable person who is an alien.
2 *United States v. Beraun-Panez*, 812 F.2d 578, 581 (9th Cir. 1987).

3 During the initial questioning, Barron-Garcia told Agent Reeder that he was from
4 Mexico and that he was in the United States illegally. At that point, there is little doubt that
5 Agent Reeder had probable cause to arrest Barron-Garcia. Rather than formally arresting
6 him immediately, Agent Reeder ordered the group, probably using the term "sigueme,"
7 which is Spanish for "follow me," to walk toward the area, approximately 1/4 mile away,
8 where he left his vehicle. (Tr. 34.) At that point, a reasonable person in Barron-Garcia's
9 position would believe he was in custody. He had answered the agent's questions about his
10 alienage and was then told to follow the agent. Even though Agent Reeder's thoughts are
11 not relevant to the reasonableness inquiry, *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984),
12 it is telling that at that point the agent would not have allowed any in the group to leave. (Tr.
13 41.)

14 The group then arrived at Agent Reeder's vehicle and were greeted by a second agent
15 who was driving a transport vehicle. At that point, their belongings were collected and they
16 were searched. Certainly if they somehow did not think they were in custody prior to that,
17 they just as certainly would think they were when greeted by a caged transport vehicle.
18 Despite being in custody, it was then that they were questioned again without the benefit of
19 *Miranda* warnings for purposes of completing the Form I213/826. The form does contain
20 a limited warning in Spanish informing detainees that they "have the right to a[n]
21 immigration tribunal, they have a right to a lawyer if they so chose that. They have the right
22 to also say I am here illegally and I wish to simply return to my country." (Tr. 23.)
23 However, the warning does not satisfy *Miranda* and Agent Reeder indicated it was not read
24 to the detainees. (Tr. 44.) The I213/826 elicited potentially incriminating information about
25 their country of origin and where and when they entered to the United States. (Tr. 22-23, 24;
26 Ex. 5.) Such questions constitute interrogation and were reasonably likely to elicit
27 incriminating responses. *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 64
28

L.Ed.2d 297 (1980). Consequently, any statements made by Barron-Garcia after he arrived at the transport vehicle were taken while he was in custody and should be excluded at trial. *See, e.g., Dickerson v. United States*, 530 U.S. 428, 441-42, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

Contrary to the government's position, *United States v. Galindo-Gallegos*, 244 F.3d 728 (9th Cir. 2001), does not support a different conclusion. In *Galindo-Gallegos*, the defendant ran from agents prior to being questioned at all. The Ninth Circuit understandably compared the questioning to which he was submitted after he was captured "as within the category of a *Terry* stop, not as custodial interrogation for *Miranda* purposes." *Id*. at 731. The agents in *Galindo-Gallegos* had not been able to dispel or confirm their suspicions by questioning the defendant before he ran and therefore the questions, despite the defendant's attempts to run away, were still necessary. In the instant case, however, the questioning permitted under *Terry* had already occurred and Barron-Garcia's subsequent statements required *Miranda* warnings.

Barron-Garcia next contends that the statement taken the following morning, on November 26, 2009, should also be suppressed pursuant to *Missouri v. Seibert*, 542 U.S. 600, 2004). The Ninth Circuit has held that under *Seibert*, "[a] trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning– in light of the objective facts and circumstances– did not effectively apprise the suspect of his rights." *United States v. Williams*, 435 F.3d 1148, 1154-57 (9th Cir. 2006). That is precisely what occurred here.

As set forth in the factual section above, Agent Claudio Lopez was charged with processing Barron-Garcia on the morning after his arrest. (Tr. 54-55.) By that time, a decision had been made to criminally prosecute Barron-Garcia. (Tr. 71.) Without reading Barron-Garcia his rights, Agent Lopez reviewed with Barron-Garcia the information contained on the I-213/826 field processing form that was completed by Agent Reeder. (Tr. 72; Ex. 5.) The information included Barron-Garcia's name, date of birth, birthplace,

8

1  mother's name, citizenship, and his eligibility to be in the United States. (Tr. 72-73.)
2  Barron-Garcia was then returned to the area of the holding cell. (Tr. 74.) Then, about half
3  an hour later, at 10:30 a.m., Agent Lopez read Barron-Garcia his *Miranda* warnings and
4  Barron-Garcia signed Form I-214, a waiver of rights. (Tr. 55-58, 78; Ex. 1.) Agent Lopez
5  then proceed to take the sworn statement, reading questions in Spanish to Barron-Garcia
6  from a form and then typing the answer. (Tr. 60-61; Ex. 2 (I-867A).) The formal statement
7  taken by Agent Lopez is almost exclusively a restatement of the information Agent Lopez
8  had informally reviewed with Barron-Garcia only 30 minutes before. He questions Barron-
9  Garcia about his biographical information, his citizenship, his parentage, any documentation
10 he might have allowing him to be in the United States, and when and where he entered the
11 United States. (Ex. 2.)

12    The objective evidence suggests that *Miranda* warnings were deliberately withheld.
13 Agent Lopez could have just have easily read Barron-Garcia the *Miranda* warnings prior to
14 reviewing the I213/826. By failing to do so, he gave Barron-Garcia no reason to appreciate
15 the importance for the *Miranda* warnings later when he had already confirmed the
16 information necessary for his prosecution. *See United States v. Narvaez-Gomez*, 489 F.3d
17 970, 974 (9th Cir. 2007) ("Objective evidence includes 'the timing, setting and completeness
18 of the prewarning interrogation, the continuity of the police personnel and the overlapping
19 content of the pre- and post-warning statements.'"). As the Supreme Court noted in *Seibert*,
20 "there was little, if anything, of incriminating potential left unsaid" at the end of the pre-
21 warning interrogation session. *Seibert*, 542 U.S. at 604-05. The sequence of events provides
22 persuasive objective indicia of a deliberate evasion of the *Miranda* warnings and Barron-
23 Garcia's November 26, 2009 statement should also be suppressed.

24    **B.    Presentment Requirements**

25    Barron-Garcia contends that his statements must be suppressed because there was
26 unnecessary delay between his arrest on November 25, 2009 and his appearance before a
27 magistrate on November 30, 2009. Rule 5 of the Federal Rules of Criminal Procedure in
28

relevant part provides, "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge or before a state or local judicial officer as Rule 5(C) provides, unless a statute provides otherwise." Fed.R.Crim.P. 5(a)(1)(A). Barron-Garcia has failed to establish that there was an unnecessary delay in bringing him before the magistrate.

"What constitutes "unnecessary delay," *i.e.*, reasonable time within which the prisoner should be brought before a committing magistrate, must be determined in the light of all the facts and circumstances of the case." Rule 5 Advisory Committed Notes, 1944 Adoption. Barron-Garcia was arrested at 6:00 p.m. on Wednesday, November 25, 2009 and it is therefore reasonable that he was not taken before a magistrate that day. It was not unreasonable that Barron-Garcia was not taken before the magistrate until the following Monday, as the Ninth Circuit has recognized that delays due to the fact that a magistrate judge is unavailable over the weekend are not unreasonable. *See United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir. 1996) ("[W]e do not believe that this provision of Rule 5(a) requires that the defendant be brought before either a federal magistrate or a state or local judicial officer at night or on the weekend.") The government has established that the Court was closed for Thanksgiving the following day and closed for business on Friday, November 27, 2009 at the direction of the Chief Judge. Accordingly, Barron-Garcia was taken before the magistrate judge on Monday, November 30, 2009, which was the next business day. Given the circumstances, the delay was not unreasonable.

**III.    RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE**

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule 1.17(d)(2), Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **GRANT** Defendant Jesus Barron-Garcia's Motion to Suppress (Docket 30) to extent described above.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within 14 days after being served with a copy of this Report and Recommendation.  If objections are not timely filed they may be deemed waived.  The parties are advised that any objections filed are to be identified with the following case number: **CR 09-02814-TUC-DCB**.

DATED this 23rd day of September, 2010.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge